[Cite as *State v. Martin*, 2012-Ohio-1519.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
GALLIA COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 09CA19 |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | DECISION AND |
| v. | : | JUDGMENT ENTRY |
| | : | |
| BRYNN K. MARTIN, | : | |
| | : | **RELEASED 03/21/12** |
| | : | |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

Harry K. Reinhart, Reinhart Law Office, Columbus, Ohio, for appellant.

C. Jeffrey Adkins, Gallia County Prosecuting Attorney, Gallipolis, Ohio, for appellee.
_____

Harsha, J.[1]

**{¶1}** Brynn K. Martin appeals his conviction for robbery arguing that the conviction is not supported by sufficient evidence. Specifically, Martin claims that the record contains no evidence from which a rationale juror could conclude that he committed all the necessary elements of robbery. We agree. The state failed to prove beyond a reasonable doubt that Martin personally inflicted, attempted to inflict, or threatened to inflict physical harm on the victim. Therefore, we conclude there was insufficient evidence to support his conviction as a principal offender. And because the jury was not given an instruction on complicity, Martin could not be convicted for aiding and abetting. Accordingly, we reverse his conviction.

I. FACTS

_____

[1] Although this appeal was originally assigned to the court on September 30, 2010, the case was reassigned to Judge Harsha on September 20, 2011.

{¶2}    Martin was indicted by the Gallia County Grand Jury and charged with the aggravated murder, murder, aggravated robbery and robbery of William Sowards.  His case proceeded to a jury trial.

{¶3}    At trial Karen Sowards, the victim's ex-wife, testified that on November 17, 2006, she went to Mr. Sowards' home because he hadn't answered the telephone in several days.  When she arrived his front door was open and Mr. Sowards was dead on the living room floor.  She testified that she tried to call 911 from his phone, but it was not working.  She flagged down a motorist and asked the motorist to call the police.  She then waited at the house until the police arrived.  She further stated that when she discovered the body, she wasn't aware of any money or Oxycontin pills missing from Mr. Sowards' home.

{¶4}    Jonathon Jenkins, a special agent with the Ohio Bureau of Criminal Identification and Investigation (BCI), testified that he processed the crime scene, including documenting the condition of Mr. Sowards' home and searching for evidence.  He stated that he found no evidence of forced entry when he arrived at the scene, where he found Mr. Sowards deceased, lying on his stomach in the living room.  He observed a "substantial amount" of blood in the room, and testified that there were "impact patterns" of blood spatter behind the couch in the living room.   He explained that these types of blood spatter patterns can result from being hit in the head with a blunt object.  Jenkins also stated that the couch cushions were removed, as were the drawers from the dresser in the bedroom.  He admitted, however, that there was no connection between Martin and the physical evidence found at Mr. Sowards' home, although he stated this is a "very common" occurrence in criminal cases.

{¶5}   He further testified that on May 21, 2008, he accompanied Special Agent Willis to interview Martin about his involvement in the case.  Jenkins stated that during the interview Martin claimed he was in a drug treatment facility at the time of the murder and "didn't admit to anything" involving Mr. Sowards' homicide.

{¶6}   Special Agent Jenkins also stated that on November 11, 2008, he again went with Special Agent Willis to interview Martin and discuss a possible plea bargain. During this interview, Jenkins testified that Martin said he knew Shawn Lawson and admitted to "making a plan."  Martin told Jenkins that "he was the driver for Mr. Lawson on the night of the murder."

{¶7}   On cross examination, Special Agent Jenkins testified that he retrieved two wooden clubs from Mr. Sowards' home, one of which was found under Mr. Sowards' left leg.  He testified that he believes Mr. Sowards was struck at least twice with a blunt object, possibly the wooden club found at the scene.  Jenkins stated that the club found under Mr. Sowards' left leg had blood on it, which he submitted to the BCI for DNA analysis.  He testified that the DNA present on the club did not match Martin's DNA.  In addition Special Agent Jenkins testified that the analysis of the substance found under Mr. Sowards' fingernails did not match Martin's DNA.

{¶8}   Next Matthew Eurrell testified that while incarcerated at the Gallia County Jail for theft and receiving stolen property, he had a conversation with Martin about the Sowards' homicide.  He testified that Martin told him that he and "another guy had went and robbed this * * * guy like two or three months in a row and then while he was in [drug treatment] that guy ended up murdered and he believed that it was the other guy" that murdered Mr. Sowards.  Eurrell believed that Martin told him they took Oxycontin pills during the two to three robberies before the murder.  Eurrell testified, however, that

Martin denied being present during the robbery and murder of Mr. Sowards in November 2006.

{¶9}   Dr. Pandey, the former Deputy Coroner for Montgomery County, testified as an expert in forensic medicine.  He stated that he performed the autopsy on Mr. Sowards and explained that Mr. Sowards suffered injuries to the left side of his head, his hands and leg.  Specifically, Dr. Pandey described the injuries to Mr. Sowards' head as "associated with a crushing effect, depression of the skull."  He summarized that the cause of the death "was blunt force trauma to the head" and the manner of death was homicide.  He also stated that he took fingernail scrapings from Mr. Sowards' right hand and that the injuries to his right hand could be consistent with defensive wounds.

{¶10}  Larry Willis, a special agent with the BCI, testified that he went to Orient Correctional Facility with Special Agent Jenkins on May 21, 2008, to interview Martin about Mr. Sowards' homicide.  During the interview Willis stated that Martin initially denied involvement or knowledge of Mr. Sowards' homicide.  Initially, Martin said he was in a drug treatment facility at the time of the murder.  When Willis informed Martin that he checked the dates and Martin wasn't in treatment, Martin admitted that he knew Mr. Sowards and used to buy drugs from him through Shawn Lawson.  Martin told Willis, that he would contact Shawn Lawson and they would go to Mr. Sowards' house together to buy the drugs.  Martin would stay in the car and Lawson would go into the house.  After 30-45 minutes, Lawson would return from Mr. Sowards' house and come out with the drugs, usually Oxycontin.  They would then split the pills.  Willis stated that Martin denied ever making a face to face drug purchase from Mr. Sowards, and said he always went through Lawson.

{¶11}  Special Agent Willis further testified that he later went back to the prison with Special Agent Jenkins.   He stated that Rhonda Oiler was also there and she met with Martin.   After she spoke to Martin, he was brought into a separate room with Special Agents Willis and Jenkins to discuss a possible plea agreement.  While waiting for some paperwork, Willis testified that Martin said "he had known about the plan for a long time, because Shawn Lawson had approached him several times about helping him."  He also testified that Martin admitted that "he was the driver on the night of the Sowards homicide, but he did not actually enter the residence."

{¶12}  Next Rhona Oiler, Martin's sister-in-law, testified about her relationship with Martin.  She stated that beginning in March 2008, the two began an intimate relationship and subsequently Martin was sent to prison for a probation violation.  While he was in prison, she spoke to him on the telephone a couple of times per day.[2]  Oiler testified that in all the phone calls with Martin, he continuously said that "he didn't do it," which she took to mean that he didn't murder Mr. Sowards.  She also believed that he knew something about the crime.  She later asked Special Agent Chad Wallace to take her to see Martin in prison because she wanted him to accept a plea bargain.  During the visit, she testified that Martin told her for the first time that "he had taken Shawn out there and he drove and that Shawn came running out and said let's go, let's go, things went wrong, let's go."  Martin continued that they then left and Lawson gave him half of the pills.  Oiler further testified that Martin explained that he drove the car and Shawn beat Mr. Sowards to death, but he always denied being in Mr. Sowards' home and

---

[2] During Rhonda Oiler's testimony, the state played several recorded phone conversations between Oiler and Martin.  These tapes were not entered into evidence and we have no record of the contents on appeal.

killing him. Oiler admitted that she also went to Mr. Sowards' house in the past to buy pills with Martin. And contrary to Martin's claim he had never been inside, she testified that Martin went inside Mr. Sowards' house to buy them alone.

**{¶13}** Finally, Detective Chad Wallace testified that he was in charge of the Sowards' homicide for the Gallia County Sheriff's Office. He testified that he received a letter from Eurrell stating that he wanted leniency in his case in exchange for information about an unsolved homicide. Detective Wallace interviewed Eurell and he described a conversation with Martin and said that Martin told him he committed at least three robberies with Shawn Lawson during the three months prior to Mr. Sowards' murder.

**{¶14}** Detective Wallace then interviewed Martin, who said he was in drug treatment at the time of Mr. Sowards' murder and did not know anything about the homicide. Wallace stated that he already knew Martin was not in drug treatment at the time of the homicide. Martin decided not to waive his Miranda rights and Detective Wallace ended the interview.

**{¶15}** On September 10, 2008, Detective Wallace testified that Oiler called him and asked if he would take her to see Martin. He testified that she told him Martin was going to be truthful and she wanted to talk to him about a plea deal so he could get out of prison. He took her to see Martin the following morning.

**{¶16}** He admitted on cross examination, that there is no physical or scientific evidence connecting Martin to the crime. Further, Detective Wallace testified that he obtained DNA samples from a number of individuals connected with the case, including Lawson and Martin, and they were unable to match the DNA found under Mr. Sowards' fingernails to any of these individuals.

**{¶17}** Following the close of evidence, the state requested a jury instruction on complicity for all four counts of the indictment, which charged Martin as the principal offender. The trial court denied the state's request. The state then filed a motion to amend the indictment and bill of particulars to include complicity on all four counts. The court overruled the motion and instructed the jury as to the charged counts in the indictment.

**{¶18}** The jury acquitted Martin of aggravated murder, murder and aggravated robbery and found him guilty of robbery, in violation of R.C. 2911.02(A)(2). The trial court sentenced him to eight years in prison. This appeal followed.

## II. ASSIGNMENTS OF ERROR

**{¶19}** Martin raises four assignments of error for our review:

**{¶20}** I. "THE CONVICTION FOR ROBBERY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND BASED UPON EVIDENCE INSUFFICIENT AS A MATTER OF LAW."

**{¶21}** II. " "THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY ADMITTING EVIDENCE OF UNCHARGED MISCONDUCT OVER DEFENSE OBJECTION FOR THE PURPOSE OF PROVING BAD CHARACTER AND THE DEFENDANT'S ACTION IN CONFORMITY THEREWITH."

**{¶22}** III. "THE TRIAL COURT COMMITTED PLAIN ERROR WHEN INSTRUCTING THE JURY ON ROBBERY."

**{¶23}** IV. "THE DEFENDANT'S RIGHTS UNDER THE STATE AND FEDERAL CONSTITUTION TO THE EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED WHERE TRIAL COUNSEL FAILED TO FILE A MOTION TO SUPPRESS

EVIDENCE PRIOR TO TRIAL, AND WHERE TRIAL COUNSEL FAILED TO OBJECT

TO THE TRIAL COURT'S JURY INSTRUCTION ON ROBBERY."

### III. SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE

{¶24}  In his first assignment of error, Martin argues that his conviction is against

the manifest weight of the evidence and that insufficient evidence exists to support his

conviction.  We will first consider whether there is sufficient evidence to support Martin's

conviction.

{¶25}  "An appellate court's function when reviewing the sufficiency of the

evidence to support a criminal conviction is to examine the evidence admitted at trial to

determine whether such evidence, if believed, would convince the average mind of the

defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after

viewing the evidence in a light most favorable to the prosecution, any rational trier of

fact could have found the essential elements of the crime proven beyond a reasonable

doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of

the syllabus (superseded by statute and constitutional amendment on other grounds).

{¶26}  This test raises a question of law and does not allow the appellate court to

weigh the evidence. *State v. Osman*, 4th Dist. No. 09CA36, 2011-Ohio-4626, at ¶39. A

sufficiency of the evidence challenge tests whether the state's case is legally adequate

to go to a jury in that it contains prima facie evidence of all of the elements of the

charged offense.  See *Portsmouth v. Wrange*, 4th Dist. No. 08CA3237, 2009-Ohio-

3390, at ¶36.

{¶27}   A conviction that is based on legally insufficient evidence constitutes a

denial of due process.  See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386-87, 678

N.E.2d 541.  And "the Double Jeopardy Clause precludes retrial once the reviewing

court has found the evidence legally insufficient to support a conviction." (Internal quotation marks omitted.) *Tibbs v. Florida* (1982), 457 U.S. 31, 40-41, 102 S.Ct. 2211, 72 L.Ed.2d 652; see also *Thompkins* at 387.[3]

{¶28}  Martin specifically argues that state failed to present evidence from which a rationale juror could conclude that he committed all the necessary elements of robbery, including that he "inflicted, attempted to inflict or threatened to inflict physical harm on another."  He claims the only direct evidence of his involvement with the crime presented by the state was the testimony of Oiler, who testified that Martin told her he drove to the scene, but never went into the house.  Because the jury was not instructed on complicity, he claims there was insufficient evidence to convict him of robbery.  We agree.

{¶29}  R.C. 2911.02(A)(2) states in relevant part: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another[.]"

{¶30}  The record reveals that the only connection between Martin and the robbery of Mr. Sowards was the testimony of Special Agents Jenkins and Willis, and that of Rhonda Oiler.  Special Agent Jenkins testified that Martin admitted that he knew Shawn Lawson and that they made "a plan."  He also stated that Martin admitted he was the driver for Lawson on the night of Mr. Sowards' murder.  Special Agent Willis testified that Martin also admitted that Lawson had approached him about helping and he had known about the plan for a long time.  However, there was no testimony

---

[3] There is a notable distinction between a reversal based upon insufficient evidence and one resting upon the weight of the evidence.  *Thompkins* at 387.  In contrast, a finding that the jury's verdict was against the weight of the evidence does not preclude a retrial under the Double Jeopardy Clause.  *Tibbs* at 43; see also *Thompkins* at 387.

presented by the state explaining what "the plan" actually consisted of. Willis also testified that Martin admitted that he was the driver, but he claimed he never actually entered Mr. Sowards' home.

{¶31} Oiler testified that during a visit with Martin in prison, he told her that he drove Lawson to Mr. Sowards' house to buy drugs and that Lawson went into the house alone. Lawson then came running out saying something went wrong and they needed to leave. She also testified that Martin admitted that Lawson murdered Mr. Sowards, but denied ever entering the house during the robbery and murder.

{¶32} There was also testimony presented by the state that Martin was excluded as the possible source of DNA under Mr. Sowards' fingernails and no other physical evidence connected him to the crime scene. The record reveals that Martin consistently denied ever being in Mr. Sowards' house the night of the murder. Although Eurrell testified that Martin admitted to robbing Mr. Sowards' on previous occasions with Lawson, there was no testimony presented that he was inside the house on the night of the murder.

{¶33} In summary, the state failed to present any testimony or physical evidence showing that Martin entered Mr. Sowards' home on the date in question and inflicted, attempted to inflict, or threatened to inflict physical harm upon him. Even after viewing the evidence in a light most favorable to the prosecution, we conclude no rational trier of fact could have found beyond a reasonable doubt that Martin committed all the necessary elements of the offense. Thus, the evidence in this case does not support Martin's conviction for robbery as the principal offender.

{¶34} However, the evidence does appear to support a conclusion that Martin was complicit in the robbery. A defendant is complicit in an offense by aiding and

abetting if he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, at syllabus. Nevertheless, "appellate courts cannot consider evidence of a defendant's complicity in a criminal act if the jury was not instructed on complicity since this would violate the defendant's Sixth Amendment right to a jury trial." *State v. Peterson*, 7th Dist. No. 06CO50, 2007-Ohio-4979, at ¶23. As a result, we are limited to considering whether the evidence supports Martin's conviction as the principal offender. See id.

**{¶35}** The state relies upon the testimony of Oiler and Eurrell that Martin and Lawson had both bought and stolen drugs from Mr. Sowards in the months before his homicide. It argues that from this testimony, it is reasonable to infer that "the plan" Martin admitted to having with Lawson was again to rob Mr. Sowards and the jury was free to reject his statement that he stayed in the car. The state also argues that because the record shows there were two wooden clubs found in Mr. Sowards' home, the jury could infer that there were two people threatening him with clubs and the second person was Martin. However, this is a far reaching inference, and not one that we believe any rational trier of fact could have used as a basis to find beyond a reasonable doubt that Martin acted as the principal offender and entered Mr. Sowards' home at the time of his murder.

**{¶36}** In summary, there is insufficient evidence to conclude beyond a reasonable doubt that Martin acted as the principal offender, entered Mr. Sowards' home and inflicted, attempted to inflict, or threatened to inflict physical harm upon him, while committing a theft offense. Accordingly, we sustain Martin's first assignment of error and reverse the judgment of the Gallia County Court of Common Pleas. Martin's

remaining assignments of errors are rendered moot and we need not address these

issues.  See App.R. 12(A)(1)(c).

JUDGMENT REVERSED
WITH INSTRUCTIONS TO
DISCHARGE THE APPELLANT.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS REVERSED WITH INSTRUCTIONS TO DISCHARGE THE APPELLANT.  Appellee shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Gallia County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

Kline, J.:  Concurs in Judgment and Opinion.
McFarland, J.:  Dissents.

For the Court

BY:  _____
        William H. Harsha, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**